Your Honors, Counsel, Ladies and Gentlemen, I'm John Horn. I represent Plaintiff Appellant Margaret Cullinan, who is appealing this case. And Ms. Cullinan testified at her hearing to limitations that precluded work altogether or at most permitted sedentary work, and under the circumstances, sedentary work might have resulted in the application of the grid to allow the claim. But the administrative law judge discredited Ms. Cullinan and found that Ms. Cullinan was capable of light work, which is lifting 20 pounds occasionally and being on her feet for six hours out of eight. Cullinan had testified she couldn't be on her feet that much and that she would miss a lot of work because of headaches. She had suffered a stroke and she had blurry vision and diabetes and obstructive sleep apnea, among other things. As we know, the testimony of a claimant can't be discredited on the basis of objective medical evidence alone. Now, I'm not conceding that the objective medical evidence supported the administrative law judge discrediting Ms. Cullinan. I'm saying that there was absolutely nothing else to support the finding that Ms. Cullinan could do light work. The ALJ relied, the administrative law judge relied on the minimal daily activities that things that Cullinan hoped to do and wished to do and planned to do. The errors are mainly focused on page 22 of the record, where the administrative law judge began by citing an exhibit that didn't exist. The administrative law judge claimed that Cullinan was too active to be consistent with her testimony. She cared for a deceased cousin in a nursing home, but at page 679, it's clear that, well, for four days in a row, she told the cousin that he should improve his eating. And then, according to the administrative law judge, Cullinan went to concerts, but there's really not much evidence of more than one concert over a period of at least two and a half years. According to the administrative law judge, Cullinan went on dates, but at page 563, it says, well, she resumed contact on an internet site, she planned to spend several days with a man, and she wanted a sexual relationship. Well, wanting something is not an activity. Long way from getting it. Pardon me? Long way from getting it. Yes, quite a ways from getting it. At page 648, it also says, she met a man and spent time with him. Well, how much time, and what did they do during that time? Well, I don't think we want to go much further down that road. She wanted to volunteer at an animal shelter. Now, the administrative law judge drew an inference that she provided total care for a grandmother, but that's not what the cited exhibit says. It really says that one of her grandmothers wanted her to provide total care for her, but she was engaged in some unclear respect with another grandmother. Then she attended her parents' anniversary and went to a wake. Supposedly that activity, which is unspecified, gives rise to an inference that she could be on her feet for six hours out of eight and lift 20 pounds, according to the ALJ, the administrative law judge. She looked for part-time work. She hoped to get work, but to be employable under the Social Security Act, you have to be capable of full-time work. So there's really no basis whatsoever for discrediting claimant. Now, then we phrased the issue of the residual functional capacity and the weighing of the opinions. Let me focus on page 742, which is the opinion of Dr. Monti-Rubiziani, to which the administrative law judge gave controlling weight. Okay, Dr. Monti-Rubiziani said that Cullinan was limited 20 to 50 percent in her ability to take public transportation, and Cullinan also testified, I think it was page 38, that she never had a driver's license. The public transportation limitation is because she can't do stairs, she can't get on a bus? Is that the reason? Do we know? I'm not sure. I think that it's more, it could be, it could be because Dr. Monti-Rubiziani was a physical doctor. Now, her psychologist limited, precluded her from public transportation altogether. But we'll leave that, let's leave that aside for a second. If Cullinan was 20 to 50 percent limited in taking public transportation, the vocational expert testified that if you're off task 15 percent of the time, you're unemployable, or more than 15 percent of the time. And the administrative law judge included no limitation to driving in the RFC except driving at work. There had to be a limitation with respect to public transportation and driving in the RFC. And if it had been in there, it would have precluded work, because if you don't show up for work more than 15 percent of the time, you're not employable. And she doesn't have a driver's license? Correct. She testified to that at page 38. And this is secondary to her stroke? She's not a candidate for a driver's license? She never had a driver's license. Never. The RFC really doesn't take too terribly much account of the whole peripheral vision issue, does it? No, it doesn't. And it should. You have to look for it by implication, in that certain activities that might be affected by eyesight are mentioned. But that's all. It doesn't give any plenary treatment to the question of peripheral vision. Right. She did testify that she stumbled a great deal. And that's part of what would have limited her to no more than sedentary work. Now, if we put the limitation of Dr. Monti-Rubiziani at page 742 to that 20 to 50 percent limitation in public transportation, together with the treating psychiatrists that Dr. Canzoni, or psychologists or psychiatrists, Dr. Canzoni's opinion that she was utterly limited from taking public transportation, we have even a more restrictive residual functional capacity or RFC. We have one case named Ragsdale that seems to imply that if the fee is in the courtroom and hears the testimony or has access to the testimony, that that excuses the ALJ for not having mentioned a particular issue with eyesight in his question, his hypothetical question. Do you have any comment on that? He's in the courtroom, he hears the testimony that she has eyesight problems, but the eyesight problems are not explicitly mentioned in the hypothetical question put to him when his turn comes to testify. And in Ragsdale we said, oh, that's all right. I'd have to argue that this court should make it clear that Ragsdale doesn't apply anymore, because that's not what the rules indicate. The difficulty with it is it has no logical limits, it would seem to me. Right. I mean, then why have a hypothetical question? Right. Then it would be just the thumbs up, thumbs down approach that this court has discouraged for so many years. Is there any other question? Thank you. Thank you. Ms. Bence. Thank you, Your Honors. My name is Julie Bence, I'm representing the Social Security Administration in this matter. And I would like to start off by noting that this is a case where, as Mr. Horne partially acknowledged, there is a treating physician opinion, Dr. Monte Rubianese's opinion, which said, issued shortly before the administrative hearing, which said that the plaintiff had no problems with walking, no problems with balance, no problems with postural activities, and that she was capable of lifting 20 pounds occasionally and 10 pounds frequently. That meets the requirements of light work under the Social Security Administration's regulations. That is one aspect of why the ALJ discredited Ms. Cullinan. You have, the ALJ's decision must be looked at as a whole, and that the ALJ was able to look at Cullinan's activities in light of her own treating physician's statement that she did not have balance problems, that she did not have problems walking, that she was capable of doing the lifting requirements that the ALJ found her to have. Again, she said she had balance problems, stumbled and caught herself. Her physician said she didn't. She said she had headaches every day, every week that lasted five days where she could do nothing but lay down. He did say that she was limited in her ability to perform daily activities by 20 percent and 20 to 50 percent reduced capacity for climbing and using public transportation. I took that to mean that she wasn't going to have a way to get around because she can't get on and off public transportation. I do not believe that that limitation precluded transportation. It said it is reduced, but it is not that she is incapable of it. Well, but if she can't do it more than 50 percent of the time, I don't know how she can work full time. If she can't get in and out of public transit. I think that that is conflating two separate issues. One is the ability to do a job. If you're capable of doing the job, it doesn't matter if the job doesn't exist near where you are and so on. I don't think that that is a question. There is frankly no, what the ALJ noted is that there is no indication in the record that indicated that she did in fact would have difficulty taking public transportation. She doesn't talk about it. It's true that she never had a driver's license, but that's not, since she never had one, that's not an impairment related limitation. And the Social Security Act is quite clear. Well, she's got no peripheral vision. She lost her peripheral vision on account of the stroke, so how is she going to get a driver's license? I don't believe that that's, that's simply something that never came up in the case. She never had one. The ALJ. Well, were these limitations accounted for in the ALJ's opinion? Yes. The ALJ did specifically encounter the after effects of her stroke, that she had lost peripheral vision on the right side only, that she had. But isn't that disqualifying for a driver's license? So she's going to be completely reliant on public transit. I have seen nothing in, I know of no law and no fact that was mentioned of there. And the ALJ did account for the lack of peripheral vision by limiting her to no driving at work, no exposure to workplace hazards, such as heights, dangerous machinery. Those are common, common limitations that account for peripheral vision problems. And again, it was not that she was, she had lost vision. She had limited vision, she had good vision except for limited peripheral vision on the right side. There was nothing that indicated that she was unable to get a driver's license. The ALJ, in fact, explicitly asked her about that at the administrative hearing, that this was a result of her stroke, and she just said, no, I've never had a driver's license. That doesn't preclude the fact that she couldn't get a driver's license, she couldn't physically drive. Well, the point is that there's no evidence. You would jump from, she didn't get a driver's license, she could have gotten one. I don't know that she could have gotten one. There's no evidence in the record that she could have gotten one, or could or could not have gotten one. It is simply stated, she had never had a driver's license. The ALJ asked, is this something as a result of the stroke? She said, no, and it was never brought up. The evidence does not indicate that she was... Whatever it is, it precludes her from private transportation. It does not preclude her from public transportation. Oh, private transportation. Dr. Monte Urbionese... I said private transportation. She doesn't have a driver's license, she can't drive to work. She has never been able to drive to work. That's okay with me. And she had said that previously she had relied on family members when she was working full-time to take her to work. Well, she also suffers from major depressive disorder. In addition to the residual physical impairments from her stroke, she does have this psychiatric diagnosis and her treating psychologist offered his opinion that her ability to sustain employment was poor, to complete a normal work week or work day even was poor, and that was discredited based on the ALJ's characterization of her daily life as very active, which is something of an exaggeration at best. The reason that the ALJ discredited Dr. Ken Zolderman, she credited his treatment notes, but not the opinion that she had poor ability, because she looked through the treatment notes and found that throughout, in every single instance where he has reflections of those, he found that she had moderate limitations. He doesn't talk about her having poor inability to socialize. There is no indication that she said, I can't go out because it's my mental impairments that keep me from going out. That's where the ALJ looked and said, what she has actually done contradicts what she claims, says she can't do, and also contradicts Dr. Ken Zolderman's own treatment notes where he never, at any point in the treatment notes, indicated that she had poor or severely restricted problems. It was always moderate problems. Her treating psychiatrist, Dr. Hal Noremo, indicated that she had only mild symptoms, and so that was why the ALJ discredited that aspect of Dr. Ken Zolderman's opinion, because she correctly noted that it was inconsistent with his treatment notes, his treatment notes throughout the period that he dealt with her. And there, I think, the district court in this instance correctly found that the ALJ's decision was thorough, thoughtful, and fully grounded in the medical evidence, and therefore supported by substantial evidence. I'd like to briefly just say something about substantial evidence. It's not meaningless boilerplate that we dutifully recite at the beginnings of our brief and then ignore. It's a stringent and consequential standard that both this court and the Supreme Court have recognized is the equivalent of clear error, clear or patent error. So the question is, is the explanation the ALJ gave clearly erroneous based on her assessment of the medical evidence? And the district clearly found that it was not clearly erroneous. It was correct and thorough, and I believe that that is the case with all of the issues that Ms. Collinan has raised. Well, the decision to discredit the treating psychologist's opinion was based on characterizing the reports of her daily activities as evidence of a very active lifestyle. And again, that was, can really only be seen as an exaggeration based on this record. I believe it is, well. Or an overstatement based on this record. Perhaps, but the point is that in terms of, not the physical activities, I believe that Dr. Monteruby-Inez's opinion takes care of the physical activities. She said, she can, essentially, she's capable of light work. But in looking at the psychological activities, what she said is, I can't do anything. I don't socialize with anyone but my sisters. I lie down most of the day because of headaches. And in fact, the ALJ noted that there was evidence of going to concerts, attending a family anniversary. Two concerts. There were two concerts. There were multiple, despite the statement of having, going out on dates, repeatedly saying she needed to get disability because living in her parents' house was crimping her dating life. That she needed to get out more. Here where it's legitimate for the ALJ to look at things she wanted to do. Because saying that she wanted to volunteer at an animal shelter is evidence that she was not limited in getting out and socializing with other people. I see my time is up. Thank you, Your Honor. If you have no further questions, I will ask that you affirm the ALJ's decision. Thank you. Thank you. Mr. Horne. Anything further? Just two brief things. If the ALJ wanted to flesh out these things, the ALJ had a hearing where she had the opportunity to do so. And she never asked that kind of question for details on these things. And as far as the opinions are concerned, if Klayman couldn't drive at work, she couldn't drive, period. And the opinion evidence is that she was limited with public transportation. So as a result of that, and that was an opinion that was given controlling weight, the RFC is inadequate. And it has to be remanded for that. And also, the pretty ridiculous finding as to credibility. Thank you. Thank you. Our thanks to both counsel. The case is taken under advisement.